In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 07-1546

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEITH A. ROBERTS,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 CR 118—**William C. Griesbach**, *Judge*.

———————

ARGUED OCTOBER 25, 2007—DECIDED JULY 7, 2008

———————

Before EASTERBROOK, *Chief Judge,* and RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge.* On September 13, 2005, Keith Roberts was charged with five counts of wire fraud in violation of 18 U.S.C. § 1343. The indictment alleged that Mr. Roberts had devised and participated in a scheme to defraud the Government by making false statements in an effort to obtain more than $320,000 in veterans' benefits. A jury trial was held, and Mr. Roberts was convicted of all five counts. The district court sentenced Mr. Roberts to 48 months' imprisonment and ordered restitution in the amount of $262,943.52. For the reasons

set forth in this opinion, we affirm the judgment of the
district court.

# I

## BACKGROUND

### A.

Mr. Roberts served on active duty in the United States
Navy from March 22, 1968 until December 23, 1971,
when he received an honorable discharge. During the
majority of his time in the service, he was stationed at
the Naval Air Facility in Naples, Italy, a non-combat
support facility for naval operations in the Mediterranean.
As an enlisted airman, Mr. Roberts was one of the lowest-
ranked men at the base. Approximately 350 military
personnel were assigned to the Naples facility. Like all
military facilities, it operated at all times under a chain
of command.

While Mr. Roberts was stationed in Naples, a traumatic
event occurred on the base. On February 4, 1969, Airman
Gary Holland was performing maintenance on a C54
aircraft when the plane's front landing gear collapsed.
As a result of the collapse, Airman Holland was pinned
inside the nose wheel well. He was trapped for approxi-
mately twelve to fifteen minutes before his shipmates
were able to raise the plane's nose and extricate him.
Airman Holland was non-responsive at all times while
he was trapped in the wheel well, and he never regained
consciousness. He died the next day due to the injuries
he had sustained in the accident.

The aviation safety officer on the base, Lieutenant
Commander Jerry Lee Fuchs, conducted an official investi-

gation of the incident. His investigation concluded that the accident had been caused by the use of a non-regulation ground lock safety pin in the plane's front landing gear. Airman Holland accidentally had dislodged the pin during maintenance. Lieutenant Commander Fuchs prepared a detailed report of his findings (the "accident report"). The accident report included his own eyewitness account, approximately 20 witness statements, photographs of the scene, photographs and data from a re-enactment, and Airman Holland's death certificate and death report form. Mr. Roberts was not mentioned in the accident report.

**B.**

The United States Department of Veterans Affairs ("VA") pays veterans two types of disability benefits: pension benefits and compensation benefits. Pension benefits are need-based benefits paid to low income combat-era veterans[1] who reach the age of 65 or become substantially disabled due to non-service-connected conditions. These payments supplement the veteran's income, including other retirement or Social Security income, in order to bring his total income up to a minimum level set by Congress. Compensation benefits, by contrast, are paid, regardless of need, to veterans who suffer from service-related disabilities. Compensation benefits have a higher ceiling than pension benefits; however, the amount varies according to the severity of the veteran's disability. A veteran cannot receive simultaneously both a disability pension and disability compensation benefits.

---

[1] Mr. Roberts qualified as a combat-era veteran because he had served during the Vietnam War.

Mr. Roberts received an honorable discharge in December 1971. Sixteen years later, in February 1987, he filed his first of many claims for benefits with the VA. Mr. Roberts' initial claim was for non-service-connected pension benefits. He alleged that a recent heart attack had rendered him 100 percent disabled and that his income was below the minimum level set by Congress. The VA concluded that Mr. Roberts' alleged disabilities were not sufficiently severe to prevent his gainful employment, and it therefore denied his claim.

In November 1990, Mr. Roberts renewed his claim for pension benefits. Along with his previous allegations of heart disease, he alleged that he suffered from non-service-connected depression, high blood pressure, angina, a pulmonary blood clot, elbow bursitis and back pain. He also stated that he had been under psychiatric treatment for manic depression since his 1987 heart attack. In addition to his claim for pension benefits, Mr. Roberts also filed a claim for service-connected compensation benefits. He alleged that he suffered from a knee condition and hearing loss that had been sustained during active duty. Concluding that Mr. Roberts had failed to show sufficient disability, however, the VA denied both of these claims.

Mr. Roberts appealed this finding. In March 1993, the VA reexamined his claim and determined that he had a combined non-service-connected disability rating of 80 percent. Accordingly, it granted him a pension benefit, retroactive to November 14, 1990. This pension benefit was based on his alleged depression and personality disorders, heart disease and other non-service-related ailments; it was not based on any service-connected disabilities.

In August 1993, Mr. Roberts filed a claim for compensation benefits. He claimed that he suffered from a service-connected personality disorder. His application read "13 Dec 1969 - Acute Personality Disorder,"[2] but it contained no supporting facts regarding his condition or its allegedly service-related cause. The VA denied his claim.

In February 1994, Mr. Roberts filed a request for compensation benefits. This claim was based on allegations that he suffered from post-traumatic stress disorder ("PTSD") stemming from an incident that occurred during the time he was on active duty. The VA provides compensation benefits for veterans disabled by PTSD if they can show (1) an official diagnosis of PTSD, (2) credible evidence that a sufficiently traumatic event occurred during active military service (an "in-service stressor") and (3) evidence that the in-service stressor is causally related to the PTSD. *See* 38 C.F.R. § 3.304(f). The claim submitted by Mr. Roberts, however, did not identify his in-service stressor, and it offered no evidence that he had been diagnosed with PTSD based on a psychological or psychiatric examination. The VA therefore sent a letter to Mr. Roberts informing him that he must provide both a detailed account of his in-service stressor and evidence of an official PTSD diagnosis before it could award him benefits. Mr. Roberts did not respond in a timely fashion; the VA therefore denied his claim.

In December 1994, Mr. Roberts renewed his claim for compensation benefits based on PTSD. This time, he submitted a handwritten statement in which he identified as his in-service stressor the incident involving

---

[2] This date was nearly a year after Airman Holland's death.

Airman Holland's death. This statement described his allegedly close relationship with Airman Holland, who he claimed had been his "very good friend." R.58 at 27. He also asserted that he had been substantially involved in Airman Holland's rescue.

Specifically, Mr. Roberts recounted that he had been "left in charge of the line shack" on the day of the incident, and therefore he had authority to run any rescue operations on the base. *Id*. He stated that, immediately after the plane's nose wheel collapsed, he had "proceeded to sound the alarm" and "run over to the plane to assess the situation." *Id*. He alleged that he had found Airman Holland "still conscious and coherent" under the plane and "informed him that [he] would get him out." *Id*. Mr. Roberts stated that he then went next door, informed the Chief Petty Officer ("CPO") of the situation and then "ordered him to bring a Cherry Picker into the front of the hangar to lift the plane." *Id*. According to Mr. Roberts, he then ordered another superior to load men inside the rear of the plane in an effort to take weight off the front wheels, and he ordered the CPO to "puncture the radome of the plane to lift it up." *Id*. At this point, a lieutenant commander allegedly "ordered [him] to stop" giving orders and, when he refused, ordered a Marine to place him under arrest. *Id*.

Mr. Roberts explained that the lieutenant commander "then proceeded to have air bags placed under the plane to lift it," a method that "took approximately 10-12 min." *Id*. He asserted that his proposed method of lifting the plane by puncturing its nose with the forklift would have taken "only a few minutes," but that the lieutenant commander had said that "it was more important to save the plane than it was to save the man." *Id*. at 27-28.

Mr. Roberts further averred that, when the plane rose enough for Airman Holland's arm to fall free, he "broke away from the Guard" and, with the help of another shipmate, extracted Airman Holland and took him to receive medical attention. *Id*. at 28. He stated that an awaiting corpsman revived Airman Holland by administering a shot of adrenaline in the heart. Nevertheless, Airman Holland died the next day due to injuries sustained in the accident. Mr. Roberts concluded his statement by asserting his firm belief that Airman Holland "would have lived if [Mr. Roberts] had not been thwarted in [his] rescue attempts" by Navy leadership. *Id*.

Despite this detailed description of his in-service stressor, in January 1995, the VA again denied Mr. Roberts' claim for PTSD benefits. It explained that he lacked any confirmation, other than his own report, of the fact that the alleged in-service stressor had occurred; it also noted that he had failed to include any record of an official PTSD diagnosis.

Through some effort, Mr. Roberts was able to obtain a copy of the accident report from the Navy in 1997. He subsequently submitted three pages from the report, including Airman Holland's death certificate and death report, to supplement his previous PTSD claim. These documents served as the necessary confirmation of his alleged in-service stressor. A VA psychologist then examined Mr. Roberts and diagnosed him with PTSD.

The VA rated the extent of Mr. Roberts' disability at 50 percent. Because the 50-percent compensation payments would have been lower than the pension benefits that Mr. Roberts already was receiving, however, Mr. Roberts elected to continue receiving his pension payments rather than compensation benefits.

In December 1998, expressing disagreement with the VA's original 50-percent disability rating, Mr. Roberts renewed his claim for compensation benefits based on PTSD. Another VA psychologist, Dr. Michael Marcy, examined Mr. Roberts. During his examination, Mr. Roberts complained of fatigue, a lack of interest and motivation, an inability to concentrate and flashbacks. He told Dr. Marcy that he attributed many of his symptoms to the death of a friend during his time of service in the Navy. Specifically, he stated his belief that Navy leaders had responded inappropriately to the accident and improperly had impeded him from directing the rescue effort. He claimed to have a distrust of authority resulting from this incident, and he stated that he often had nightmares about the accident. Dr. Marcy concluded that, because of the death of his friend, Mr. Roberts had become emotionally and socially isolated, suffered from intrusive recollections, drank alcohol to forget the incident, distrusted authority and had occasional suicidal thoughts. Based on Mr. Roberts' description of the incident and his reported symptoms, Dr. Marcy diagnosed him with PTSD.

In May 1999, based on a review of Mr. Roberts' file and Dr. Marcy's diagnosis, the VA rated Mr. Roberts as 100 percent disabled. Accordingly, it granted him full compensation benefits for his PTSD, retroactive to August 4, 1993. Mr. Roberts received these benefits—including a large lump sum for the retroactive benefits—by direct deposit into his bank account.

In March 2002, Mr. Roberts filed another claim with the VA. This time, he asserted that his PTSD benefits should have been applied retroactively to December 23, 1971, his active duty discharge date. In August 2003, the VA agreed to pay compensation benefits retroactively

from July 16, 1992, but not from his date of discharge. Mr. Roberts was not satisfied with that effective date, and, in December 2003, he contacted Special Agent Ray Vasil of the VA Office of Inspector General. He claimed that the VA's denial of an earlier effective date for his benefits was in violation of the law, and he asked Agent Vasil to review his claims.

In response to Mr. Roberts' requests, Agent Vasil obtained his file. In the process of reviewing his claims, however, Agent Vasil became curious about Mr. Roberts' statements indicating that he had directed the Holland rescue effort. Consequently, he began an investigation into Mr. Roberts' claims. He questioned Mr. Roberts about the Holland incident on two separate occasions. Agent Vasil also obtained the accident report from the Navy, which the VA had been unable to obtain prior to that point. Finally, he interviewed several surviving witnesses, including: Fuchs, the author of the original incident report; Jack Tankersley, who had operated the forklift used during the incident; Keith Dreher, who had extricated Airman Holland and brought him to the awaiting corpsman for treatment; Martin Sunglao, who claimed to have been Airman Holland's best friend on the base; and others who had been at the scene.

These witnesses completely contradicted Mr. Roberts' version of the story. They explained that airmen had no authority on the Naples base and that they did not remember an airman running the rescue operation—which, they noted, would have been highly unusual. They stated that they also did not remember any other disturbance or arrest at the scene. They told Agent Vasil that the plane had not been raised by airbags, as Mr. Roberts had stated; instead, it had been raised by a forklift using straps.

Tankersley averred that no airman had ordered him to do anything; he also noted that he had never considered puncturing the plane's radome because it was made of composite materials, and putting the forklift through the radome would not have lifted the plane. The witnesses consistently stated that Airman Holland had been neither conscious nor coherent during the time that he was trapped under the plane, and they agreed that he had not been revived after the incident. Finally, Sunglao, who claimed to have been Airman Holland's best friend, told Agent Vasil that he did not remember Mr. Roberts and that, given this fact, it was unlikely that Airman Holland and Mr. Roberts had been roommates or friends.

The VA Office of Inspector General compiled Agent Vasil's findings in a report and concluded that Mr. Roberts had not been present during Airman Holland's accident and attempted rescue. Based on this report, the VA informed Mr. Roberts in August 2004 that it was discontinuing his compensation payments.

In June 2005, Mr. Roberts appealed this cessation of his benefits to the Board of Veterans' Appeals. He claimed that his PTSD in fact had been caused primarily by a *different* in-service stressor—an incident that had occurred in December 1969, when he was arrested by the Shore Patrol for intoxication, taken to a hospital, placed in a straightjacket and given Thorazine. The Board of Veterans' Appeals affirmed the VA's decision to discontinue payment of PTSD benefits to Mr. Roberts.

Mr. Roberts then appealed the decision of the Board of Veterans' Appeals to the United States Court of Appeals for Veterans Claims, where, according to the record before us, it currently is pending.

## C.

On September 13, 2005, while his appeal was pending before the Court of Veterans' Appeals, a grand jury returned a superceding indictment that charged Mr. Roberts with five counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleged that Mr. Roberts had provided materially false information to the VA in a scheme to obtain fraudulently veterans' benefits. It further alleged that Mr. Roberts had received these benefits through interstate wire communications in the form of electronic funds transfers from the Department of Treasury's financial center in Austin, Texas, to his bank account in Bonduel, Wisconsin.

The matter proceeded to a jury trial. At the conclusion of the Government's case in chief, Mr. Roberts filed a motion for judgment of acquittal based on insufficiency of the Government's evidence, which the district court denied. On November 8, 2006, a jury found Mr. Roberts guilty of all five charged counts. After a hearing, the district court sentenced Mr. Roberts to 48 months' imprisonment as well as restitution in the amount of $262,943.52. Mr. Roberts timely appealed his conviction and his sentence.

## II

## DISCUSSION

### A.

Mr. Roberts first submits that the district court should have dismissed this case for lack of jurisdiction. He points to the fact that his criminal conviction was based upon a determination of the truthfulness of the statements that

he made in his claims for veterans' benefits—an issue currently being litigated in the appeal of his benefits stoppage that is pending before the Court of Appeals for Veterans Claims. Because that court has exclusive jurisdiction to review decisions of the Board of Veterans' Appeals regarding benefit claims,[3] and it has not yet made a final determination regarding the truthfulness of his claims, Mr. Roberts contends that the criminal case was both premature and beyond the jurisdiction of the district court.[4]

This contention is without merit. As Mr. Roberts notes in his jurisdictional statement on appeal, the district court had jurisdiction in this case based on 18 U.S.C. § 3231, which provides for jurisdiction over "all offenses against the laws of the United States." The district court did not "review" the decision of the Board of Veterans' Appeals

---

[3] *See* 38 U.S.C. § 7252(a) ("The Court of Appeals for Veterans Claims shall have exclusive jurisdiction to review decisions of the Board of Veterans' Appeals."); 38 U.S.C. § 511 ("The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans . . . the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court.").

[4] Mr. Roberts makes an additional, amorphous due process claim based on 38 U.S.C. § 6103 and 38 C.F.R. § 14.561. His claim seems to be that his criminal prosecution circumvents statutory administrative remedies in place for veterans and forces him to defend himself in two separate forums simultaneously. This assertion, however, was made for the first time on appeal and therefore was forfeited. *McCann v. Mangialardi*, 337 F.3d 782, 786-87 (7th Cir. 2003).

regarding his disability rating or entitlement to benefits; instead, it simply judged whether Mr. Roberts had committed a federal crime in the process of obtaining these benefits.

Although both the criminal case in the district court and the benefits appeal before the Court of Appeals for Veterans Claims involve the question of whether Mr. Roberts made false statements in his veterans' benefits claims, the criminal prosecution is independent of the administrative review process. Indeed, 38 C.F.R. §§ 1.200-05 requires VA employees to report information about actual or possible criminal violations to appropriate law enforcement entities for criminal investigation. Mr. Roberts points to no statutory or regulatory provision that bars criminal prosecution until a veteran's benefits adjudication becomes final.[5] We conclude that the district court properly denied Mr. Roberts' motion to dismiss for lack of jurisdiction.

---

[5] In his reply brief, Mr. Roberts for the first time mentions 38 C.F.R. § 14.561, which provides that "[b]efore a submission is made to the U.S. Attorney in cases involving personnel or claims, the General Counsel . . . or the Regional Counsel . . . will first ascertain that necessary administrative or adjudicatory (forfeiture (see Pub.L. 86-222; 73 Stat. 452), etc.), action has been taken; except that in urgent cases such as breaches of the peace, disorderly conduct, trespass, robbery, or where the evidence may be lost by delay, or prosecution barred by the statute of limitations, submission to the U.S. Attorney will be made immediately." Even if this regulation gave Mr. Roberts some cognizable right to prevent early deferral, arguments raised for the first time in a reply brief are waived. *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 669 (7th Cir. 2004).

**B.**

Mr. Roberts next challenges the sufficiency of the evidence supporting his conviction. The standard of review for sufficiency of the evidence challenges is necessarily "a daunting one," however: The defendant must show that, "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006) (internal quotation marks and alterations omitted). We shall not "weigh the evidence or second-guess the jury's credibility determinations" on appeal. *Id*.

To obtain a conviction for wire fraud under section 1343, the Government must demonstrate: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the . . . wires . . . in furtherance of the fraudulent scheme." *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007); *see also United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007); *United States v. Strickland*, 935 F.2d 822, 828 (7th Cir. 1991). Mr. Roberts does not dispute that interstate wire communications were used here; he contends only that the Government presented insufficient evidence to sustain a jury finding that he had participated in a scheme to defraud.

**1.**

Mr. Roberts first submits that the Government failed to prove beyond a reasonable doubt that his statements to the VA regarding Airman Holland's death were false. Specifically, he contends that the jury's decision to credit the accident report and the statements of witnesses at

trial over the conflicting statements of Mr. Roberts was unreasonable. He notes that the witnesses' statements were provided more than twenty years after the incident occurred, and more than a decade after Mr. Roberts made his statements to the VA. He also points to the fact that the accident report had been produced only to determine how the accident happened, not to outline the totality of the events surrounding the rescue attempt. In his view, reliance on that report or on the stale memories of others present at the scene to discount his account of the incident was not rational.

We repeatedly have refused to question the credibility of witnesses.[6] We have noted that "it is not our role, when reviewing the sufficiency of the evidence, to second-guess a jury's credibility determinations." *Radziszewski*, 474 F.3d at 485 (internal citations, quotation marks and alterations omitted). Therefore, "we reverse credibility determinations on appeal only under exceptional circumstances, such as where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Id.* (internal quotation marks omitted). Such is not the case here.

Weaknesses in eyewitness identification testimony can be exposed through cross-examination, *see United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999), and Mr. Roberts

---

[6] *See, e.g.*, *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007) (explaining the extraordinary deference accorded to jury determinations of witness credibility); *United States v. Saulter*, 60 F.3d 270, 275 (7th Cir. 1995) ("Questions of credibility are solely for the trier of fact, so such arguments are wasted on an appellate court.").

had an opportunity to cross-examine these witnesses at trial. The jury was aware of the length of time that had passed between Airman Holland's death and Mr. Roberts' trial, and it was aware of the problems inherent in using eyewitness testimony to prove a negative. Nevertheless, it chose to believe the testimony of the Government's witnesses and to disbelieve Mr. Roberts' version of the facts. We cannot say that the jury's decision here was unreasonable.

The Government produced a plethora of evidence that suggested Mr. Roberts' statements to the VA were false. Eight Navy veterans testified about the events surrounding Airman Holland's death, and each substantially contradicted Mr. Roberts' version of the story. Most notably, the veterans each testified that they did not remember Mr. Roberts leading the mission, and that for an airman to have assumed such responsibilities in a rescue mission would have been extremely unusual—and therefore memorable. They testified that the attempted rescue mission had been orderly and well-managed, and they did not remember anyone being arrested or restrained at the scene. They also stated that Airman Holland had not been conscious at any point after he was crushed by the plane. One witness testified that he had been a close friend of Airman Holland, but he did not remember Mr. Roberts; therefore, he thought it unlikely that Airman Holland and Mr. Roberts had been close friends. Furthermore, the Government introduced as evidence Mr. Roberts' service records, which showed that his performance actually had improved after Airman Holland's death.

In addition to eyewitness testimony contradicting his version of events, the Government introduced evidence

that Mr. Roberts had altered his story on a number of occasions. His original February 1994 PTSD claim mentioned nothing about the Holland incident. When asked in March to provide details about his in-service stressor, Mr. Roberts failed to respond until December, nine months later; he then provided his own handwritten statement of the events surrounding Airman Holland's death. When pressed for confirmation of the in-service stressor, Mr. Roberts sent the VA only three pages of the accident report, despite the fact that he had obtained the full report from the Navy. Furthermore, although he had obtained his PTSD benefits by identifying the Holland incident as his in-service stressor, after Agent Vasil's investigation, he claimed that the primary cause of his PTSD actually had been a 1969 incident involving a strait-jacket and Thorazine. Finally, the Government also offered the testimony of Agent Vasil himself, who recounted numerous conflicting statements made by Mr. Roberts during Agent Vasil's investigation of the claims.

The jury, after hearing all of the evidence from both sides, found that Mr. Roberts had made false statements to the VA. On the evidence in this record, the jury was entitled to reach that conclusion.

**2.**

Mr. Roberts next contends that, even if he had made false statements to the VA, the Government failed to prove that such statements were material, as required by the Supreme Court in *Neder v. United States*, 527 U.S. 1, 25 (1999). He submits that, because the VA merely re-quires a claimant to establish the existence of an in-service stressor and a diagnosis of PTSD, any false statements

about the *extent* of his involvement in the incident would not have changed the VA's benefits determination. In his view, "no misrepresentation would be material, so long as the VA could verify that the claimed incident (Holland's death) occurred and that the claimant was stationed at that location at that time." Appellant's Br. at 37.

Mr. Roberts misapprehends the meaning of "material" in the context of wire fraud. As we stated in *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999), "[a] statement is material if it would be *capable* of influencing the decisionmaker's decision; . . . there is no requirement that the statement must *in fact* influence the decision-maker (that would be reliance)." *Id.* (emphasis added). The materiality inquiry addresses the *nature* of the statements made rather than the defendant's actual ability to influence the VA's decision to grant veterans' benefits. *Id.*

The Government presented testimony from a VA claims administrator that a veteran's own explanation of his role in the event had the capacity to influence the VA's decisions. Additionally, Dr. Marcy testified that he in fact had relied on the information provided by Mr. Roberts regarding both his role in the event and his relationship to Airman Holland when he diagnosed him with PTSD. The jury reasonably could have inferred that Mr. Roberts' false statements at least played a role in his obtaining his PTSD diagnosis and, subsequently, his VA benefits. The Government therefore presented sufficient evidence that Mr. Roberts' false statements were material.

### 3.

Mr. Roberts further contends that the Government failed to prove beyond a reasonable doubt that he had the

requisite intent to defraud. To prove an intent to defraud, "we require a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007) (citations and quotation marks omitted). "Direct evidence of an intent to defraud is rare," however, and we have held that the Government may prove a specific intent to defraud through "circumstantial evidence and inferences drawn from the scheme itself that show that the scheme was reasonably calculated to deceive individuals of ordinary prudence and comprehension." *Id.*

The Government presented evidence that Mr. Roberts made false statements to the VA in an effort to obtain veterans' benefits. The record might also have supported a jury determination that Mr. Roberts sincerely believed that his statements were true and that he had no intention to defraud the Government; however, the jury was entitled to infer from the evidence that his motive in making these false statements was to defraud the Government and to obtain undeserved compensation benefits. It is beyond our authority to disturb such a finding on appeal.

In sum, we conclude that the Government presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Mr. Roberts had committed wire fraud.

## C.

Mr. Roberts next submits that the Government failed to disclose exculpatory evidence that was material to his conviction in violation of the standard set forth in *Brady*

*v. Maryland*, 373 U.S. 83 (1963). Specifically, he alleges that the Government deliberately failed to produce the entirety of the accident report, which he contends would have contained exculpatory evidence.

The Government correctly points out, however, that, before the district court, Mr. Roberts never challenged the completeness of the accident report. Despite having had opportunities to do so, he never requested a hearing on his *Brady* claim. Instead, Mr. Roberts simply made numerous pre-trial references to his general belief that the Government was withholding evidence from him—so often that the district court granted a motion *in limine* to bar him from making such a suggestion to the jury without first filing a specific discovery request. Nevertheless, Mr. Roberts declined to request a *Brady* hearing before the district court. Accordingly, he has waived this issue. *See United States v. Payne*, 102 F.3d 289, 293 (7th Cir. 1996).

Even if Mr. Roberts had preserved his *Brady* claim, however, it is without merit. Under *Brady*, the Government has the obligation to disclose any evidence in its possession that is both material and favorable to a defendant. *United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006); *United States v. Fallon*, 348 F.3d 248, 251 (7th Cir. 2003). This evidence includes impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Baker*, 453 F.3d at 422. To establish a *Brady* violation, the defendant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial. *Baker*, 453 F.3d at 422.

Mr. Roberts' *Brady* claim is based on the accident report that was compiled during the initial investigation of the

events surrounding Airman Holland's death. The report included a number of photographs, many of which were used by the Government at trial. Each photograph in the report was stamped on the back with a serial number. Based on this numbering scheme, it appears that some photographs[7] may be missing from the copy of the report provided by the Government. Mr. Roberts claims that the Government intentionally provided him with an incomplete version of the accident report because the other photographs contained evidence that would have corroborated his version of the events.

Mr. Roberts provides no evidence, however, that these allegedly missing photographs ever were included in the accident report; nor did he request a hearing on the issue. Neither party explains the significance of the numbering system on the back of the photographs; it is quite possible that the serial numbers were stamped on the photographs by the photographer or the printer well before the report was compiled.

More significantly, Mr. Roberts did not present any evidence that the Government is in possession of any of these missing photographs; nor does he provide any reason to believe that the photographs, if discovered, would be exculpatory. *See United States v. Mitchell*, 178 F.3d 904, 907 (7th Cir. 1999) (noting that "mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for in camera inspection, much less reversal for a new trial"); *United States v. Morris*, 957 F.2d 1391, 1402-03 (7th Cir. 1992) (explaining that the

---

[7] Specifically, photographs XAD-3170, 3174, 3175, 3178, 3182, and 3187-90 appear to be missing from the collection of photographs.

defendant must provide some evidence other than mere speculation or conjecture that evidence was exculpatory and suppressed by the Government). Consequently, Mr. Roberts' *Brady* claim must fail.

### D.

Finally, for the first time on appeal, Mr. Roberts maintains that the district court violated his rights under the Sixth Amendment and the rule established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when it determined the amount of loss for purposes of sentencing without submitting the issue to the jury. Because Mr. Roberts failed to raise this issue before the district court, however, our review is limited to plain error. *United States v. Jones,* 245 F.3d 645, 648 (7th Cir. 2001).

Under the sentencing guidelines, the base offense level for a violation of 18 U.S.C. § 1343 is 7. *See* U.S.S.G. § 2B1.1(a)(1). This offense level may be increased by up to 30 levels depending on the amount of loss attributable to the defendant's fraud. *Id*. § 2B1.1(b)(1). In the context of wire fraud, we have defined "loss" as either "actual" or "intended" loss, whichever is greater. *See United States v. Brownell*, 495 F.3d 459, 461 (7th Cir. 2007). The sentencing guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss as "the pecuniary harm that was intended to result from the offense . . . including pecuniary harm that would have been impossible or unlikely to occur." *Id*. (citing U.S.S.G. § 2B1.1).

Representatives of the VA testified that Mr. Roberts actually received $262,944.12 in improper veterans' benefits based on his fraudulent PTSD claims, and that he also

had requested additional retroactive payments in the amount of $288,391.26.[8] Based on this testimony, the district court found that the total loss from Mr. Roberts' fraud amounted to $551,334.78. As this loss was in excess of $400,000, the court concluded that Mr. Roberts was eligible for a 14-level increase in his offense level. *See id*. § 2B1.1(b)(1)(H).

Because the sentencing guidelines allow a 14-level increase for a loss in excess of $400,000, compared with a 12-level increase for a loss in excess of $200,000, Mr. Roberts contends that the jury should have been allowed to find the total amount of loss involved beyond a reasonable doubt. In his view, the district court's finding of loss by a preponderance of the evidence violated *Apprendi*.

We have conclusively rejected this argument in cases where the sentence imposed is less than the statutory maximum. *See United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005) ("With the guidelines now merely advisory, factfindings that determine the guidelines sentence do not determine the actual sentence, because the sentencing judge is not required to impose the guidelines sentence; and so the Sixth Amendment is not in play."); *United States v. Jones*, 245 F.3d 645, 651 (7th Cir. 2001) (holding that a district court may find facts related to sentencing by a preponderance of the evidence, so long as that determination does not result in the imposition of a sentence in excess of the statutory maximum penalty for that crime). As we noted in *Jones*, "we have repeatedly

---

[8] The Government also requested that the district court consider potential future payments in excess of $1 million; however, the court denied this request because the amount was too speculative.

held that when a defendant is sentenced to a term of imprisonment within the statutory maximum for the crime of which he was convicted, *Apprendi* is beside the point." *Jones*, 245 F.3d at 645 (internal quotation marks omitted).

The statutory maximum sentence for a wire fraud conviction under 18 U.S.C. § 1343 is 20 years' imprisonment. Mr. Roberts was sentenced to 48 months' imprisonment and restitution in the amount of $262,943.52. We find no plain error in this sentence.

### Conclusion

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED