# United States Court of Appeals
# for the Federal Circuit

---

**KEITH A. ROBERTS,**
*Claimant-Appellant,*

v.

**ERIC K. SHINSEKI, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee.*

---

2010-7104

---

Appeal from the United States Court of Appeals for Veterans Claims in 05-2425, Chief Judge William P. Greene, Jr.

---

Decided: June 1, 2011

---

ROBERT P. WALSH, of Battle Creek, Michigan, argued for claimant-appellant.

SCOTT D. AUSTIN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and MARTIN F. HOCKEY, JR., Assistant Director. Of counsel on the brief were MICHAEL J. TIMINSKI, Deputy

Assistant General Counsel, and MARTIE ADELMAN, Attorney, United States Department of Veterans Affairs, of Washington, DC.

————————————————

Before GAJARSA, PROST, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

This appeal involves the severance of a veteran's service-connected benefits based on a finding of fraud. Specifically, a Department of Veterans' Affairs ("VA") regional office ("RO") severed veteran Keith A. Roberts's benefits for post-traumatic stress disorder ("PTSD") after an investigation revealed that Roberts provided fraudulent statements in connection with his claim. Those fraudulent statements related to the sole in-service stressor the RO identified when awarding benefits in 1998. As it relates to this appeal, the Board of Veterans' Appeals ("Board") found that the severance was proper, and the United States Court of Appeals for Veterans Claims ("Veterans Court"), sitting en banc, affirmed. *See Roberts v. Shineski*, 23 Vet.App. 416 (2010) (en banc).

Because Roberts, represented by counsel, challenges only discrete aspects of the Veterans Court decision, the issues on appeal are narrow. The first is whether the VA and the Board erred by severing Roberts's benefits in accordance with the VA's regulations rather than pursuant to the procedures set forth in the Program Fraud Civil Remedies Act of 1986 ("PFCRA"), 31 U.S.C. § 3801 *et seq.* The second is whether the VA was required to review Roberts's medical records for alternate stressors before severing his benefits, when the only stressor cited in his ratings decision, and the underlying PTSD examination, was found to be fraudulent. Because the Veterans Court correctly decided that the Board did not err in its decision

on either issue, we affirm.[1]

BACKGROUND

Roberts served on active duty in the United States Navy from March 1968 to December 1971, spending the majority of his service stationed at a Naval Air Facility in Naples, Italy. During a March 1991 psychiatric examination at a VA medical center, Roberts reported that he witnessed the death of a friend, Gary Holland, in an

_____

[1] We express no opinion on those portions of the opinion that the parties have not challenged on appeal. Specifically, we pass no judgment on the Veterans Court's holding that severance of benefits based on fraud is not subject to a clear and unmistakable error ("CUE") analysis under 38 C.F.R. § 3.105(d). *See Roberts v. Shinseki*, 23 Vet.App. 416, 424-29 (2010). Roberts, through counsel, expressly disclaimed that he was appealing that ruling, both in his brief and at oral argument. *See* Appellant's Br., pp. 37, 41 (stating that "§ 3.105(d) has no role in a benefits fraud case other than the implementation of the order from an ALJ or District Court under the PFCRA," and "[w]hen benefits fraud is alleged, CUE is not available to the government, the allegation must be adjudicated under the PFCRA"); *see also* Oral Arg. at 11:12 – 11:28 and 12:58 – 13:23, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-7104/all (at oral argument, when asked whether he was appealing the Veterans Court's holding that the CUE analysis does not apply in this case, Roberts's counsel responded twice that CUE does not apply). For the same reasons, we do not address Roberts's argument that there was not, in fact, any CUE in the Board's original grant of benefits. Because the Veterans Court's majority opinion did not address the propriety of the Board's CUE finding, and because Roberts concedes that CUE does not apply to severance based on fraud, the Board's CUE analysis is not properly before us.

accident at an airplane hangar while they were stationed together in Naples. The accident occurred on February 4, 1969. According to the medical report, Roberts indicated that part of a plane fell on and crushed Holland, and that Roberts "was arrested for damaging the plane while trying to extricate his friend." Joint Appendix ("JA") 1062. The examiner noted that "nothing appears in the service records about this incident." *Id.*

Roberts also reported during the same examination that, in a separate incident on December 13, 1969, he was "arrested, placed in a straight jacket and restraints by shore patrol." *Id.* Roberts's clinical records corroborate that incident, indicating that, after having a few drinks, Roberts became annoyed when shore patrol asked him questions and for identification, fled and fell into a ditch, and then became "combative and assaultive" when taken to the dispensary. JA 969. The examiner diagnosed Roberts as having dysthymia with irritability and mixed personality disorder with antisocial and borderline features.

A. *Roberts's Award of Disability Benefits*

In August 1993, Roberts submitted a claim for disability compensation for an acute personality disorder, which he amended in February 1994 to include service connection for PTSD. In support of his claim, he submitted a letter to the RO in which he detailed the events of the death of his "very good friend" Gary Holland in 1969. JA 1185-86. In the letter, Roberts reported that Holland was working on a plane when Holland's coat became entangled on a safety pin on the plane, releasing the safety pin and causing a piece of the plane to fall on and crush Holland. Roberts went on to write the following:

> I proceeded to sound the alarm, ran over to the plane to assess the situation at which time I found

Gary still conscious and coherent. I informed him I would get him out and then proceeded to run next door to the Ground Support Unit, informed a chief petty officer of the situation and ordered him to bring a cherry picker to the front of the hanger [sic] to lift the plane.

As I was returning to the hanger [sic] I confronted my 1st class superior and informed him to place a ladder at the rear hatch of the plane and load men into the tail section to relieve the front[.]  I then proceeded to the front of the plane and instructed the [ground support engineering] chief to puncture the radome of the plane to lift it up[.] [A]t this time a [lieutenant commander] who informed me he was the safety officer ordered me to stop [and] when I refused, he had me placed on arrest by a Marine guard[.] The [lieutenant commander] then proceeded to have air bags placed under the plane to lift it (this took approx 10-12 minutes, my method would have taken only a few minutes). The [lieutenant commander] stated that it was more important to save the plane than it was to save the man. When the plane had risen enough [. . .], I broke away from the guard and I and another shipmate proceeded under the plane and extradited [sic] Gary to an awaiting corpsman who gave Gary a shot of Adren[a]lin[e] in the heart and revived him. He was then transported by chopper to the NATO Hospital where he passed away the next day (brain dead).

I have always believed Gary would have lived had I not be[en] thwarted in my rescue attempts.

JA 1185-86.  In March 1998, Roberts underwent a VA

PTSD examination and again reported the death of Gary Holland as a traumatic stressor. The examiner diagnosed Roberts with, among other things, chronic PTSD.

A few months later, in May 1998, the RO awarded Roberts a 50% disability rating for service-connected PTSD, effective August 4, 1993. The Rating Decision cited only one stressor to support its determination that Roberts's PTSD was directly related to military service – Roberts's presence at and role in the accident that caused Gary Holland's death. JA 1285-91. Roberts disagreed with the disability rating, and, in May 1999, the VA awarded him a 100% disability rating for PTSD with dysthymia and depression, effective August 4, 1993. The Rating Decision noted that "[t]he veteran reported that he thinks about the traumatic event of his friend's death three to four times each month at the minimum and when he is reminded of the event he can think of the events weekly or more." JA 1308. Roberts also stated that "he is preoccupied with the trauma for six to seven days at a time," and he reported "increased problems with anger control and that he has nightmares of the death of his friend." *Id.* In 2002, Roberts requested reconsideration of his effective date. Ultimately, the RO changed his effective date to July 16, 1992, a date with which Roberts again disagreed.[2]

B. *The OIG Investigation*

In January 2004, Roberts complained by telephone to the VA Office of the Inspector General ("OIG") that the

---

[2]    Around this time, Roberts also claimed service connection for other medical conditions secondary to his service-connected PTSD as well as for dysthymia and depression separate from PTSD. The RO denied these claims. Those decisions, and the Veterans Court's decision to remand Roberts's separate claim for dysthymia and depression, are not at issue on appeal. *See infra*, n.3.

VA had mishandled his claim. Thereafter, in July 2004, the OIG investigated Roberts's claim and issued a lengthy report, which found that Roberts's statements about his presence at and involvement in the accident that caused Gary Holland's death were not supported by the record. Specifically, the OIG found that the Navy Judge Advocate General ("JAG") Corp report of the 1969 accident did not list Roberts's name anywhere, and that Roberts was not mentioned in any of the nineteen witness statements about the accident. Several of the witnesses the OIG interviewed stated that Roberts worked in a different shop and was not present at the accident. Holland's roommate reported that neither he nor Holland were friendly with Roberts. The OIG also interviewed Roberts in connection with its investigation, and reported that Roberts maintained his version of the events and "began to yell and curse" when confronted with evidence that contradicted his statements. JA 2554. The OIG provided the investigation report to the RO, the VA Secretary's office, and the United States Attorney's Office for the Eastern District of Wisconsin.

C. *Severance of Benefits*

On August 18, 2004, the RO sent Roberts a notification proposing to sever his benefits on the basis of fraud. The letter outlined the findings contained in the OIG report and informed Roberts that the RO found Roberts's statements regarding Gary Holland's death to be fraudulent. In response, Roberts submitted a statement requesting that the VA refrain from severing his benefits until the proposed severance can be appealed to the Board of Veterans Appeals. On November 10, 2004, the RO issued a decision severing Roberts's benefits on the basis of fraud.

Roberts appealed the RO's decision to the Board,

which affirmed the decision to sever benefits pursuant to a two-step inquiry. First, it found fraud on the basis of the OIG investigation, such that Roberts's benefits were subject to severance even though they were in effect for more than 10 years. *See* 38 C.F.R. § 3.957 (benefits in effect for more than 10 years "will not be severed except upon a showing that the original grant was based on fraud . . ."). Next, under 38 C.F.R. § 3.105(d), the Board found that the government established that there was CUE in the original RO decision granting benefits. The Board also rejected Roberts's argument that the VA should have considered his December 1969 shore patrol incident as a possible stressor before severing benefits. It found that "no additional stressors were in fact presented to the VA in connection with the veteran's initial claim of entitlement to service connection for PTSD." JA 931. It also noted that the May 1998 rating decision cited only the death of Gary Holland as a stressor, as did the March 1998 examination report on which the rating decision was based. *Id.*

On April 23, 2010, the Veterans Court issued an en banc decision with two separate opinions concurring in part and dissenting in part. *See Roberts v. Shinseki*, 23 Vet.App. 416 (2010) (en banc). The majority affirmed the severance of benefits based on fraud but found that the CUE analysis of 38 C.F.R. § 3.105(d) does not apply to severance proceedings alleging fraud.[3] *Id.* at 424-29. In

---

[3] As noted above, this holding is not at issue on appeal, and we do not address it. *See supra*, n. 1. The majority also concluded that the Board erred in denying Roberts's separate claim for dysthymia and depression. *Roberts*, 23 Vet.App. at 430-31. It remanded the matter for the Board to conduct that analysis and consider additional evidence from Roberts on this point. *Id.* at 430. On appeal, the Secretary does not challenge the Veterans Court's decision to remand this aspect of the case. *See*

the absence of any specific regulation governing severance based on fraud, the court found that general due process safeguards of 38 C.F.R. § 3.103 set out the applicable procedures. As it pertains to this appeal, the Veterans Court was unanimous in rejecting Roberts's argument that the VA was required to refer allegations of fraud to an administrative law judge ("ALJ") pursuant to the PFCRA. *Id.* at 424. The court found that, "under § 42 of the implementing regulation, no allegations of liability may be referred to an ALJ if the false claims or false statements resulted in a monetary gain of more than $150,000." *Id.* (citing 38 C.F.R. § 42.6(a)(2) and 31 U.S.C. § 3803(c)(1)). Because Roberts received over $320,000 in VA benefits, the Veterans Court found no error in not referring this case to an ALJ under the PFCRA. *Id.* The Veterans Court also upheld the Board's determination that the VA was not required to consider evidence of alternate stressors before severing Roberts's benefits, noting that Roberts failed to provide evidence of additional stressors within the 60-day period to do so. *Roberts*, 23 Vet.App. at 429-30. The court also noted that Roberts could pursue a separate claim based on any additional stressors, but that, in this case, "the Board did not adjudicate a claim for service connection for PTSD based on stressors *other than* the stressor found to be fraudulent (e.g., the shore patrol incident) and was not required to do so as part of the severance proceeding." *Id.* at 430, n.6 (emphasis in original).

D. *Criminal Prosecution*

Contemporaneous with the VA's proceedings to sever Roberts's benefits, Roberts was indicted on five counts of

---

Oral Arg. at 17:40–17:50, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2010-7104/all.

wire fraud, based on allegations that he "did knowingly devise and participate in a scheme to defraud the VA of compensation benefits," and that, "[a]s a result, Roberts wrongfully obtained from the VA in excess of $320,000." *United States v. Roberts*, Case No. 05cr118 (E.D. Wis. Sept. 13, 2005) (superseding indictment, ECF No. 32-2). A jury convicted Roberts on all five counts, and the district court sentenced Roberts to 48 months imprisonment and ordered restitution in the amount of $262,943.52. *Id.* at ECF Nos. 150, 171. The Seventh Circuit affirmed, rejecting, among others, Roberts's argument that the district court lacked jurisdiction because the Veterans Court possesses exclusive jurisdiction to review Board decisions. *United States v. Roberts*, 534 F.3d 560, 567-68 (7th Cir. 2008).

STANDARD OF REVIEW

Our review of Veterans Court decisions is limited by statute. Under 38 U.S.C. § 7292(a), we may review "the validity of a decision of the [Veterans] Court on a rule of law or of any statute or regulation . . . or any interpretation thereof (other than a determination as to a factual matter) that was relied on by the Court in making the decision." Unless the appeal presents a constitutional issue, we "may not review (A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case." 38 U.S.C. § 7292(d)(2). We review legal determinations by the Veterans Court under a de novo standard. *See Arzio v. Shineski*, 602 F.3d 1343, 1345 (Fed. Cir. 2010).

The Veterans Court's decision that the PFCRA does not require the VA to refer this matter to an ALJ is a decision involving a statutory interpretation and, thus, is within our jurisdiction to review. In addition, the question of whether the VA, in the context of a severance

proceeding, must consider evidence of alternate stressors before severing benefits that were awarded on the basis of a single, fraudulent stressor, is a challenge to a rule of law that is also within our jurisdiction to review.[4]

DISCUSSION

A. *The PFCRA*

The PFCRA was enacted in 1986 to allow administrative agencies to pursue remedies for false or fraudulent claims for benefits or payments. *See* 31 U.S.C. § 3802; *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 786, n.17 (2000); *Orfanos v. Dep't of Health & Human Servs.*, 896 F. Supp. 23, 24-25 (D.D.C. 1995). The statute subjects violators to a civil penalty of $5,000 per claim and to an assessment, in lieu of damages, of up to twice the amount of such claim. 31 U.S.C. § 3802(a)(1); 38 C.F.R. § 42.3(a). According to the VA's implementing regulations, allegations of liability under the PFCRA are referred to the VA OIG, who conducts an investigation and reports to the VA General Counsel. 38 C.F.R. § 42.4. If the General Counsel believes there is adequate evidence of liability, the General Counsel can only issue a complaint under this regulatory scheme after providing written notice to the Attorney General of its intentions and after receiving a statement of approval from the Attorney General. *Id.* at §§ 42.5, 42.6. After the General Counsel issues a complaint and receives an answer, the matter is referred to an ALJ for a hearing.

---

[4]   Although it is unclear, Roberts appears to challenge the underlying determination that he committed fraud. The question of whether Roberts's statements were fraudulent, however, is a factual question over which we lack jurisdiction. *See* 38 U.S.C. § 7292(d)(2); *Flores v. Nicholson*, 19 Vet.App. 516, 522 (2005) (findings of fraud are factual questions).

38 C.F.R. § 42.11.

The PFCRA is a "sister scheme" to the False Claims Act ("FCA") and is "designed to operate in tandem with the FCA." *Stevens*, 529 U.S. at 786, n.17. The legislative history of the PFCRA indicates that it was intended to address "small-dollar cases" of fraud against the government because, in such cases, the "cost of litigation generally exceeds the amount recovered, thus making it economically impractical for the Justice Department to go to court." *See* H.R. Rep. No. 99-1012, at 257-59 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 3902-04. Consistent with that purpose, the PFCRA does not apply to allegations of liability where the fraudulent claims at issue are for more than $150,000. 31 U.S.C. § 3803(c)(1); 38 C.F.R. § 42.6(a)(2). The legislative history refers to this figure as a "jurisdictional cap." H.R. Rep. No. 99-1012, at 259.

Roberts's fundamental argument on appeal is that the PFCRA is "controlling law," such that "[o]nce an allegation of fraud has been made the PFCRA must be followed." Appellant's Br., pp. 5, 40, 49. He contends that VA employees "may not conduct fraud adjudications," because such adjudications are quasi-criminal in nature, are unsuitable for ex parte adjudication, and are inconsistent with the VA's veteran-friendly claims process.[5] *Id.*

---

[5] Notably, Roberts's position before this court directly contradicts his position during his criminal proceeding. In that proceeding, Roberts moved to dismiss the indictment, arguing that the VA was the appropriate agency to make determinations about veterans benefits because of its "specialized knowledge, expertise and connection with the regulation of Veterans' Benefits." *United States v. Roberts*, Case No. 05cr118 (E.D. Wis. May 9, 2006) (Motion to Dismiss the Indictment on Grounds of Violation of Separation of Powers Doctrine,

Roberts contends that, if the VA referred this matter to an ALJ pursuant to the PFCRA, Roberts would have had "proper notice, a neutral forum, and due process as provided by the Fifth and Sixth Amendments of the Constitution." Reply Br., p. 1. In effect, Roberts argues that the VA's *only* course of action to sever his benefits because of fraud was through the PFCRA, and because the VA did not follow that course, it improperly severed Roberts's benefits and violated his constitutional rights.

There are several reasons why Roberts's position is without merit. Most significantly, the PFCRA is not an exclusive remedy. The remedies it provides are "in addition to any other remedy that may be prescribed by law." 31 U.S.C. § 3802(a)(1). Even if the VA were required to act pursuant to the PFCRA, that would have no effect on the VA's ability to sever Roberts's benefits.

The Veterans Court also correctly concluded that the jurisdictional cap in the PFCRA precluded the VA from pursuing a complaint under that statute. *Roberts*, 23 Vet.App. at 424. The PFCRA does not apply when more than $150,000 "is requested or demanded in violation of [31 U.S.C. § 3802]" in a fraudulent claim or a group of related fraudulent claims. 31 U.S.C. § 3803(c)(1); 38 C.F.R. § 42.6(a)(2). As indicated above, the legislative history expressly refers to this restriction as a "jurisdictional cap." H.R. Rep. No. 99-1012, at 259. Here, the record clearly reflects that Roberts's fraudulent claims exceeded the $150,000 jurisdictional threshold of the PFCRA. Indeed, Roberts appears to concede as much. Reply Br., p. 14. That the jurisdictional threshold was exceeded is confirmed by the results of Roberts's criminal proceeding, in which Roberts was ordered to pay over

---

ECF No. 103, p. 5). Here, Roberts argues the opposite – that the VA is incapable of making such determinations.

$260,000 in restitution. Thus, putting aside whether the PFCRA was the *required* procedure, it clearly was not *available* given the amount of penalties and assessments at issue.

Roberts contends that the $150,000 amount is not jurisdictional, citing *Orfanos v. Department of Health & Human Services*, 896 F. Supp. 23 (D. D.C. 1995). In that case, however, the petitioner fraudulently obtained only $13,400 in violation of the statute, far below the jurisdictional cap. *Id.* at 25. Although the district court affirmed an award of $196,800 under the PFCRA, the vast majority of that was based on an assessment of $170,000 in penalties and an additional $13,400 as a result of double damages, amounts which are not considered for purposes of the jurisdictional limit. That case, therefore, did not implicate the PFCRA's jurisdictional cap and does not support Roberts's argument.

Finally, even if the amount at issue was less than $150,000, there is nothing in the relevant statutory or regulatory language that compels the VA to act pursuant to the PFCRA in lieu of utilizing its own procedures. Roberts's assertion that the VA is not permitted to act on matters relating to fraud is inconsistent with the statutes and regulations that specifically refer to severance of service connection based on fraud. *See, e.g.*, 38 U.S.C. § 1159 (service connection for disability or death in effect for ten or more years shall not be severed "except upon a showing that the original grant of connection was based on fraud"); 31 C.F.R. § 3.957 (same).

To the extent Roberts challenges the VA's ability to *recoup* benefits through avenues other than the PFCRA (as distinct from severing them), that argument is without merit. The Government has several mechanisms at its disposal to recover benefits resulting from fraudulent

claims, and the PFCRA specifically contemplates parallel criminal proceedings. *See* 31 U.S.C. § 3803(b)(3) (providing that a proceeding under the PFCRA shall be stayed if the Attorney General believes it "may adversely affect *any pending or potential criminal or civil action*" (emphasis added)); 38 C.F.R. § 42.4 (contemplating deferring a report to a reviewing official "to avoid interference with a criminal investigation or prosecution"). Indeed, the very purpose of requiring agencies to obtain approval from the Attorney General before instituting an administrative proceeding under the PFCRA is to permit the Attorney General to pursue an action at his election. *See* H.R. Rep. No. 99-1012, at 258 ("This procedure ensures that the [Justice] Department will have an opportunity to review the charges and elect, if it so chooses, to litigate in federal court"). In this case, the Government instituted a criminal proceeding, and Roberts concedes that there is a valid and enforceable criminal restitution order in place.[6]

Moreover, the VA's severance of benefits based on fraud does not improperly displace other mechanisms to recoup benefits because severance simply cuts off benefits prospectively, it does not result in the automatic recovery of past payments. While it is true that the effective date of a "discontinuance or reduction" of benefits based on an act of commission or omission by the payee is the effective date of the award, 38 U.S.C. § 5112(b)(9); 38 C.F.R. § 3.500(b)(1), that only establishes that there has been an overpayment of benefits. The Government can recoup that overpayment through several avenues, including through a criminal proceeding, the PFCRA, if applicable, or the FCA. Here, the Government pursued a criminal proceeding, which, as discussed above, is entirely com-

---

[6] *See* Oral Arg. at 5:35-5:45, available at http://www.cafc.uscourts.gov/oral-argument-recordings/2010-7104/all.

patible with the PFCRA.

Roberts also contends that the VA violated his Fifth and Sixth Amendment rights by failing to refer the matter to an ALJ pursuant to the PFCRA. Specifically, he asserts that he "was denied a copy of the OIG report, a full statement of the allegations against him, and the opportunity to challenge them." Appellant's Br., p. 6. To the extent this argument reiterates his contention that the VA was required to act pursuant to the PFCRA, we reject it for the reasons stated above.

We do not see any other support for Roberts's contention that his constitutional rights were violated. In August 2004, the VA provided notice to Roberts of its proposed severance of his service connection with a cover sheet explaining his rights to submit evidence within sixty days, to request a personal hearing, and to legal representation. The notice referred to the OIG investigation (about which Roberts was aware because he was interviewed in connection with that investigation), included five paragraphs detailing the findings of the investigation, and the reasons why the VA found Roberts's prior statements regarding Holland's death to be fraudulent. On appeal, the Board conducted a hearing in June 2005, at which Roberts and his wife testified and during which he was represented by counsel. The Veterans Court correctly concluded that these procedures satisfied the VA's procedural due process safeguards.[7] *See* 38 C.F.R. § 3.103 ("Every claimant has the right to written

---

[7] As noted above, Roberts also was convicted of fraud in a criminal proceeding in federal district court under a much higher "beyond a reasonable doubt" standard and with the benefit of the accompanying constitutional safeguards inherent in such a proceeding. His conviction was affirmed on appeal by the Seventh Circuit. *United States v. Roberts*, 534 F.3d 560 (7th Cir. 2008).

notice of the decision made on his or her claim, the right to a hearing, and the right of representation"). Accepting Roberts's position on this point would require this court to find that the VA's procedural safeguards, even when followed faithfully, do not satisfy the requirements of constitutional due process. We find no justification for such a conclusion.

## B. Consideration of Other Stressors

Roberts also argues that the Board erred in failing to consider additional stressors, such as the December 1969 shore patrol incident described above, before severing his benefits based on fraud. The Board rejected this argument, finding that: (1) no additional stressors were presented to the VA in Roberts's initial claim of service connection for PTSD; (2) the May 1998 rating decision cited only the death of Gary Holland as a stressor; and (3) the March 1998 examination report on which the rating decision was based cited only Gary Holland's death as a stressor. The Board also observed that "it appears that the veteran raised the purported additional stressors only after service connection for PTSD was granted and the veteran's role in the Gary H. incident was being questioned, evidently in an effort to shore up a claim which was in the process of falling apart." JA 931. The Veterans Court upheld the Board's determination, noting that Roberts could pursue a separate claim based on any additional stressors, but that the Board here did not adjudicate a claim for service connection on stressors other than the one found to be fraudulent. Accordingly, it held that the Board was not required to consider other stressors "as part of the severance proceeding." *Roberts*, 23 Vet.App. at 430, n.6.

We agree with the Veterans Court. Roberts presented only one stressor as part of his initial claim, which the

Board ultimately determined to be fraudulent. Under those circumstances, the Board did not err in severing Roberts's benefits before considering other potential stressors.[8]

## CONCLUSION

For the reasons stated above, the decision of the Veterans Court is affirmed.

## COSTS

Each party shall bear its own costs.

## AFFIRMED

---

[8] We also have considered Roberts's other arguments and find them to be without merit or so perfunctory as to be insufficient to raise an argument on appeal.