GREENE, Chief Judge:
Veteran Keith A. Roberts appeals through counsel an August 26, 2005, decision of the Board of Veterans’ Appeals (Board) that determined that it was proper for a VA regional office (RO) to sever his May 1998 award of VA service connection for post-traumatic stress disorder (PTSD) with dysthymia and depression based on findings of fraud and clear and unmistakable error (CUE). The Board also (1) denied an effective date prior to July 16, 1992, for the grant of service connection for PTSD with dysthymia and depression, (2) denied separate compensable ratings for dysthymia and depression, (3) dismissed Mr. Roberts’ motions that various other RO decisions were based on CUE, and (4) denied compensation for his tobacco use, alcohol abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, a pulmonary disorder, and arthritis of the right knee, all claimed as secondary to PTSD. Record (R.) at 1-41.
Because the Board correctly found that Mr. Roberts’ award of service connection was based on fraud and, based on the finding, permissibly severed that award of service connection after providing him notice and an opportunity to respond in compliance with both the general due process procedures set forth in 38 C.F.R. § 3.103 and its own internal procedures provided in the VA Adjudication Procedures Manual (M21-1MR), the Court will affirm that part of the August 2005 Board decision that determined that severance of Mr. Roberts’ award of service connection for PTSD with dysthymia and depression was proper. Further, because the Board failed to consider whether Mr. Roberts’ dysthy-mia and depression were directly related to service, that part of the Board decision denying Mr. Roberts’ claim for separate compensable disability ratings for dysthy-mia and depression will be set aside and the matters remanded for further adjudication. The remainder of the Board’s decision will be affirmed.
I. BACKGROUND
Mr. Roberts served honorably in the U.S. Navy from March 1968 to December 1971. His military entrance medical examination noted no psychiatric abnormalities. A December 13, 1969, medical treatment note states that Mr. Roberts had been examined after he fell into a ditch. The treatment note indicates that, at that time, Mr. Roberts smelled of liquor and was “combative [and] boisterous.” R. at *418 60. The medical report records that, as treatment, he was injected with Thorazine, placed into a straightjacket, and then placed into bed restraints overnight.
A. Death of Gary Holland
During a March 1991 VA psychiatric examination, Mr. Roberts reported that on February 4, 1969, while serving in Naples, Italy, he witnessed the accidental death of his friend Gary Holland, which occurred in an airplane hangar when parts of an airplane fell on and crushed Mr. Holland. Mr. Roberts stated to the examiner that “he was arrested for damaging the plane while trying to extricate his friend.” R. at 159. In his report, the examiner noted that there was nothing in Mr. Roberts’ service record regarding “this incident.” Id. Mr. Roberts also reported that in December 1969, he had been “arrested, placed in a straight jacket and restraints by the shore patrol,” an incident that the examiner noted was “corroborated in [Mr. Roberts’] records and in a report of a brief psychiatric hospitalization.” Id. The examiner opined that Mr. Roberts had dysthymia with irritability and mixed personality disorder with antisocial and borderline features.
B. Claims for Personality Disorders and PTSD
In August 1993, Mr. Roberts claimed VA disability compensation for an acute personality disorder, which he stated began in December 1969. During a September 1993 VA mental disorders examination, Mr. Roberts again reported that he continued to be haunted by his friend’s accidental death. The VA examiner concluded that Mr. Roberts suffered from dysthymia, alcohol abuse, and mixed personality disorder with borderline and antisocial features.
In February 1994, Mr. Roberts amended his claim to include service connection for PTSD. He submitted to the RO a letter recounting that one day in January 1969, while he was in charge of the line shack, which was responsible for directing planes and rescue missions at the Naval Air Station in Naples, Gary Holland, his “very good friend,” was working on the nose wheel of a plane when his coat became entangled on a safety pin that released the front end of the plane, causing it to fall and crush him. R. at 282. Mr. Roberts specifically reported:
I proceeded to sound the alarm, ran over to the plane to assess the situation at which time I found Gary still conscious and coherent. I informed him I would get him out and then proceeded to run next door to the ground support unit, informed a chief petty officer of the situation and ordered him to bring a cherry picker to the front of the hanger to lift the plane.
As I was returning to the hanger I confronted my 1 st class superior and informed him to place a ladder at the rear hatch of the plane and load men into the tail section to relieve the front[.] I then proceeded to the front of the plane and instructed the [ground support engineering] chief to puncture the radome of the plane to lift it up[.][A]t this time a [lieutenant commander] who informed me he was the safety officer ordered me to stop [and] when I refused, he had me placed into arrest by a Marine guard[.] The [lieutenant commander] then proceeded to have air bags place under the plane to lift it, this took approx 10-12 minutest • • • • ] The [lieutenant commander] stated that it was more important to save the plane than it was to save the man. When the plane had risen enough, I broke away from the guard and I and another shipmate proceeded under the plane and extradited [sic] Gary to an awaiting corpsman who gave Gary a shot of Adren[a]lin[e] in the heart. He was *419 then transported by chopper to the NATO Hospital where he passed away the next day (brain dead).
I have always believed Gary would have lived had I not be[en] thwarted in my rescue attempts.
R. at 282-83. Subsequently, Mr. Roberts provided to the RO a death report certifying that Gary Doyle Holland died on February 5,1969, as a result of multiple contusions of the head and chest that occurred when “the nose wheel strut failed and collapsed while he was working in the nose compartment of a VC-54S aircraft, thus pinning him to the sides and top or back of the nose compartment.” R. at 372.
In March 1998, Mr. Roberts underwent a VA PTSD examination, during which he again reported witnessing his friend’s death. In the resulting medical report, the examiner stated that Mr. Roberts’ claims file had been reviewed and that his PTSD stressor had been verified by the RO. The examiner recorded that Mr. Roberts’ “mood was seriously depressed and affect was blunted[, t]hought processes were clear and organized and thought content was obsessed with the death of his friend, Gary.” R. at 378. Based on these findings, the examiner diagnosed Mr. Roberts as having, inter alia, chronic PTSD.
C.RO’s Award of Service Connection for PTSD
In May 1998, after finding that Mr. Roberts’ reported stressor — witnessing the death of his friend Gary Holland — was credible and had been corroborated, the RO awarded service connection for PTSD. The RO assigned a 50% disability rating for the condition, effective August 4, 1993 (the date Mr. Roberts claimed service connection for a personality disorder). Mr. Roberts disagreed with the disability rating and, in May 1999, the RO awarded him a 100% disability rating for PTSD with dysthymia and depression, effective August 4,1993.
In February 2002, Mr. Roberts requested reconsideration of the effective date for service connection for PTSD. He also claimed service connection for several other medical conditions secondary to his service-connected PTSD, which the RO denied. In June 2002, the RO determined that an effective date before August 4, 1993, was not warranted. Mr. Roberts appealed, and in September 2002 submitted a motion to revise several RO decisions on the basis of CUE. In March 2003, the effective date was changed to July 16, 1992, based on the RO’s finding that Mr. Roberts had submitted an informal claim on that date. Mr. Roberts again disagreed with the effective date assigned.
D. Claim for Dysthymia and Depression
As he sought an effective date earlier than July 16, 1992, Mr. Roberts also claimed VA benefits for dysthymia and depression, separate from PTSD. That claim was denied in a February 2003 RO decision on the basis that 38 C.F.R. § 4.14 barred separate ratings or “pyramiding” for these already secondarily service-connected conditions. Mr. Roberts disagreed with the decision.
E. July 2004 Inspector General’s Report
In January 2004, Mr. Roberts complained to the VA Office of the Inspector General (IG) Office of Investigations that VA had mishandled his claim. The IG investigated Mr. Roberts’ complaint and, in July 2004, issued a lengthy report finding that Mr. Roberts’ claims file revealed inconsistencies surrounding his claimed in-service stressor. The investigator discovered that the 1969 Navy Judge Advocate General Corps (JAG) accident report concerning Gary Holland’s death did not mention Mr. Roberts witnessing Mr. Holland’s death and did not identify Mr. Roberts among the persons interviewed by the *420 Navy JAG investigator. The investigation report further noted that Gary Holland’s roommate stated that “neither he nor [Gary] Holland was friendly with [Mr.] Roberts,” despite Mr. Roberts having reported Gary Holland to be a “good friend.” R. at 1629.
The IG investigator interviewed several witnesses to Gary Holland’s death who had been identified by the Navy JAG investigator’s report. All of the witnesses testified that Mr. Roberts was not present at the scene of the accident. The IG investigator also interviewed Petty Officer Samuel Chiarella, who supervised all of the shops in the hangar where Mr. Holland was killed. Petty Officer Chiarella reported that he knew both Gary Holland and Mr. Roberts and that he did not remember seeing Mr. Roberts at the accident scene. The investigator also interviewed William W. Stewart, who was the airframes shop chief petty officer at the time of the 1969 accident and who also served as commander of 12 men in the branch, including Gary Holland. Mr. Stewart stated that he did not know Mr. Roberts and that Mr. Roberts did not work in the same shop as Gary Holland. Mr. Stewart’s account was corroborated by both Lieutenant Commander Harold R. Trusdale and Paul W. Solomon, the quality assurance officer at the time of the accident.
The IG investigator further interviewed the Navy JAG investigator, Lieutenant Commander Fuchs, another witness who stated that immediately after the accident he had reported to the accident scene and interviewed all personnel present who had witnessed the accident or participated in the rescue operations. When asked by the IG investigator if any personnel at the scene might not have been interviewed, Lieutenant Commander Fuchs replied that “all present were accounted for and interviewed.” R. at 1642. The IG investigator also questioned Mr. Roberts, who maintained that he was the first person to arrive at the accident scene and that he had directed the rescue efforts. Mr. Roberts stated that at that time he had been interviewed for more than an hour by the Navy JAG officer in charge of the investigation. After a later interview, the IG investigator reported that Mr. Roberts became angry during that interview when he was informed that other witnesses had stated that he was not at the scene of the accident.
F. Proposed Severance of PTSD Award
In August 2004, after considering the IG’s findings, the RO concluded that Mr. Roberts had committed fraud in presenting his claim for PTSD, and the RO proposed to sever that award. Specifically, the RO determined that Mr. Roberts’ accounts of “witnessing] the accidental injury of Gary Holland, and having participated in the rescue operations of Gary Holland, are found to be fraudulent in light of the additional documentation received from the IG.” R. at 1331. Mr. Roberts was advised of the Secretary’s proposed action, and in September 2004 he submitted a statement requesting that the Secretary not sever his service connection “until such said proposed severance can be appealed” to the Board. R. at 1337-40, 1354. In a November 2004 letter to the RO, Mr. Roberts argued that under this Court’s caselaw, he needed only to show that he was stationed at the military unit where the claimed in-service stressor supporting his PTSD claim occurred and was not required to corroborate his physical proximity to the claimed stressor. During a June 2005 hearing before the Board, Mr. Roberts testified that when he filed his PTSD claim, he had presented the RO with two other stres-sors — specifically, being held in a *421 straightjacket and being hospitalized and treated with Thorazine.
G. August 2005 Board Decision
In its August 2005 decision, the Board, inter alia, determined that it was proper for the RO to sever Mr. Roberts’ award of VA benefits on the basis of fraud. In doing so, the Board set forth the following two-step analysis:
First, the Board must determine whether the protection of the rating may be overcome. That essentially involves inquiry into fraud on the part of the veteran in applying for service connection. Assuming the rating is no longer protected, the Board must then look at the propriety of the severance itself. That involve[s] inquiry into the matter of whether service connection was established based on CUE.
R. at 14. Applying this analysis, the Board first determined that because Mr. Roberts’ award of service connection for PTSD had an effective date of July 16, 1992, and thus, had been in effect for more than 10 years before the November 2004 RO decision, the award was potentially qualified for protection under 38 U.S.C. § 1159 and 38 C.F.R. § 3.957. The Board noted that a protected award of service connection cannot be severed “except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge.” R. at 15 (citing § 3.957). The Board reasoned that fraud, for purposes of § 3.957, is defined as “an intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts, for the purpose of obtaining or retaining ... eligibility for [VA] benefits, with knowledge that the misrepresentation or failure to disclose may result in the erroneous award or retention of such benefits.” Id. (citing 38 C.F.R. § 3.1(aa)(2) (2005)). Considering the definition of fraud, the Board concluded that, based on evidence in the IG report, Mr. Roberts’ statements “that he not only was present at the accident scene but initially led the rescue attempt [of Mr. Holland], made in connection with his claim for VA monetary benefits, is unquestionably and manifestly false.” R. at 19. Therefore, the Board found that Mr. Roberts’ original award of service connection for PTSD was based on a stressor that was false, which rendered his award of service connection unprotected under § 3.957. The Board then considered the RO’s severance action.
The Board agreed that severance was proper under any one of the following three alternative theories: (1) The May 1998 RO decision granting service connection for PTSD was clearly and unmistakably erroneous as the statutory or regulatory provisions then in effect were not properly applied; (2) the May 1998 RO decision was based on CUE because the correct facts, as they were known at the time, were not before the adjudicator; and (3) § 3.105(d) severs service connection based on a change in diagnosis, and a November 2004 VA medical opinion concluded that Mr. Roberts no longer had PTSD.
Also in the decision here on appeal, the Board denied Mr. Roberts’ claims for entitlement to an effective date earlier than July 1992 for his PTSD and for VA benefits for tobacco use, alcohol abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, pulmonary disorder, and arthritis of the right knee, all claimed as secondary to PTSD. The Board concluded that as Mr. Roberts was no longer service connected for PTSD, these conditions could not be secondarily service connected. R. at 32-33, 38-40. The Board also denied *422 his claims for separate compensable ratings for dysthymia and depression because “the assignment of separate ratings under 38 C.F.R. § 4.25 assumes and requires the existence of a service[-]connected disability,” and since Mr. Roberts filed his claim for separate ratings, service connection for PTSD with dysthymia and depression had been severed; therefore there was no legal basis to provide separate ratings. R. at 33-34. This appeal followed.
II. CONTENTIONS OF THE PARTIES[1]
Mr. Roberts argues that the Court should either review de novo and reverse the Board’s determination that he committed fraud or remand the matters to require the Board to provide an adequate statement of reasons or bases. In supplemental briefing, he also asserts for the first time that the Board erred by determining that he had committed fraud without first referring the matter to the IG, the VA Office of the General Counsel (OGC), and a Title 5 administrative law judge (ALJ) in accordance with 31 U.S.C. § § 3801-3812 and 38 C.F.R. § 42.1 et seq. Alternatively, he contends that the Board’s determination that there was CUE in the May 1998 RO decision granting him service connection for PTSD with dysthymia and depression, which the Board reached by applying 38 C.F.R. § 3.105(d), was arbitrary, capricious, and contrary to law. He contends that the Board’s statement of reasons or bases for this conclusion was inadequate because, inter alia, VA did not obtain shore patrol reports or otherwise attempt to corroborate additional events as potential PTSD stressors. He also maintains that the Board erred by relying on what he believes is an inadequate medical examination. Finally, he urges the Court to vacate the remainder of the Board decision because the matters are inextricably intertwined with the issue of severance of service connection.
The Secretary contends that the Court is collaterally estopped from addressing whether Mr. Roberts’ use of Gary Holland’s accidental death as a stressor was indeed fraudulent because the same issue has been litigated and decided by the U.S. District Court for the Eastern District of Wisconsin. He further asserts that Mr. Roberts’ alternative arguments are either moot or meritless. According to the Secretary, the process for severing service connection set forth in § 3.105(d) is not applicable to cases in which a finding of fraud has been made.[2] He argues that the introductory language of § 3.105 removes the procedural safeguards set forth in subsection (d) from cases where it has been established that a claimant fraudulently received VA benefits. He asserts that, where fraud is involved, the applicable procedural processes are instead found in 38 *423 C.F.R. § 3.103. Consequently, he asserts that the Board’s decision should be affirmed.
III. DISCUSSION
A. The Board’s Finding of Fraud
The record does not support Mr. Roberts’ contention that the Board erred in finding fraud. “Fraud” is defined by VA regulation as an
intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts, for the purpose of obtaining or retaining, or assisting an individual to obtain or retain, eligibility for Department of Veterans Affairs benefits, with knowledge that the misrepresentation or failure to disclose may result in the erroneous award or retention of such benefits.
38 C.F.R. § 3.1(aa)(2) (2009 & 2005). Although Mr. Roberts suggests that the Court review this determination de novo, a finding of fraud is a factual determination reviewed under the “clearly erroneous” standard of review. See Farless v. Derwinski, 2 Vet.App. 555, 556 (1992). A finding of fact is clearly erroneous when the Court, after reviewing the entire evidence, “ ‘is left with the definite and firm conviction that a mistake has been committed.’ ” Gilbert v. Derwinski, 1 Vet.App. 49, 52 (1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).
In finding that Mr. Roberts had fraudulently secured the award of VA benefits, the Board reviewed all of the statements made by Mr. Roberts “in conjunction with his original claim and in conjunction with the RO’s actions to sever service connection.” The Board also considered Mr. Roberts’ February 1994 PTSD questionnaire, the evidence included in the 1969 Navy investigation report, and in the July 2004 IG’s investigation report. Relying on the substance of this evidence, the Board concluded that Mr. Roberts’ 1994 statement that he had been present at the scene of Mr. Holland’s accidental death and led the ultimately unsuccessful rescue attempt was “unquestionably and manifestly false.” R. at 19. The Board found “particularly significant” Mr. Roberts’ shifting account of his being the primary player in the rescue attempt to his assertion that he need only to show that he was stationed at the Naples Naval Air Station at the time of the incident; the Board concluded that this shifting account lead “inevitably to the conclusion that either his initial statements of direct involvement were intentionally false, or the more recent statements of merely being on base are intentionally false.” R. at 21. Either way, the Board determined that Mr. Roberts’ statements was intentionally false and were made to obtain or retain VA benefits.
The Board further determined that there was “no question” that Mr. Roberts had knowledge that his false statements might result in the erroneous award or retention of VA benefits because he had been notified several times by VA that his claim for compensation for PTSD had been denied for lack of an in-service stressor. Id. Therefore, the Board concluded that Mr. Roberts’ award of VA benefits for PTSD were based on a fraudulent single stressor — Gary Holland’s accidental death.
It is the Board’s duty to weigh the evidence. Burger v. Brown, 5 Vet.App. 340, 342 (1993) (“The [Board], as factfinder, is required to weigh and analyze all the evidence of record.”). Here, to conclude that Mr. Roberts intentionally misrepresented the truth for the purpose of securing VA benefits and thus to find fraud, the Board relied on the inconsistencies in Mr. Roberts’ account of the 1969 in-service inci *424 dent, the contradictions in Mr. Roberts’ statements as disclosed in the IG report, and Mr. Roberts’ statements made in support of his claim for benefits Based on the record as a whole, the Board’s findings are plausible and not clearly erroneous, and its statement of reasons or bases is understandable and facilitative of judicial review. See Farless, 2 Vet.App. at 556; Gilbert, supra; see also Allday v. Brown, 7 Vet.App. 517, 527 (1995) (Board’s statement “must be adequate to enable a claimant to understand the precise basis for the Board’s decision, as well as to facilitate review in this Court”).[3]
B. 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1 et seq.
In supplemental briefing, Mr. Roberts argues for the first time that the Board erred by making a fraud determination in this matter in the first instance. He asserts that allegations of fraud should be referred to the IG, the OGC, and a Title 5 ALJ in accordance with 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1 et seq. In October 1986, Congress enacted the Program Fraud Civil Remedies Act (PFCRA), Public Law 99-509 (codified at 31 U.S.C. §§ 3801-3812) to establish an administrative remedy against any person who makes, or causes to be made, a false claim or written statement to certain Federal agencies. However, under § 42 of the implementing regulation, no allegations of liability may be referred to an ALJ if the false claims or false statements resulted in a monetary gain of more than $150,000. 38 C.F.R. § 42.6(a)(2) (2009); see also 31 U.S.C. § 3803(c)(1). Because Mr. Roberts was paid over $320,000 in VA benefits as a result of his fraudulent statements, United States v. Roberts, 534 F.3d 560, 563 (7th Cir.2008), the Board did not err by making its fraud determination without first referring the issue to an ALJ.
C. Severance of Service Connection for Fraud
Mr. Roberts also argues that, after the Board made its fraud determination, the Board erred in finding under 38 C.F.R. § 3.105 that there was CUE in the 1998 RO decision. Responding to the Secretary’s contention that we need not address these arguments because § 3.105 does not apply to cases of fraud, Mr. Roberts notes that although § 3.957 permits severing VA benefits for fraud, it also states that the 10 year period is to be computed “after compliance with § 3.105(d).” He insists that the Board did not comply with the requirement in § 3.105(d) that severance could occur only when the evidence showed that service connection was “clearly and unmistakably erroneous.” As discussed below, we reject Mr. Roberts’ arguments.

1. 38 C.F.R. § 3.105 does not apply in cases of fraud.

Initially, the Court already has held that where a prior award is later found to be “clearly illegal,” compliance with the provisions of § 3.105 is not necessary because that subsection does not apply to such cases. Allen v. Nicholson, 21 Vet.App. 54, 61-62 (2007) (holding that § 3.105(d) need not be addressed where claimant does not have the requisite service); Venturella v. Gober, 10 Vet.App. 340, 342 (1997) (holding *425 that the provisions of 38 C.F.R. § 3.105(a) and (d) do not apply when the claimant does not possess the requisite service because there is no legal entitlement to service connection); 38 C.F.R. § 3.105 (2009) (“The provisions of this section apply except where ... the evidence establishes that service connection was clearly illegal.”). Moreover, the language of § 3.105, its history, and its place in the regulatory scheme support the Secretary’s assertion that it is not applicable in cases of fraud,
a. Interplay Between § 3.105(d) and § 3.957
Although subsection (d) of § 3.105 specifically addresses revisions of decisions where service connection is severed, it also explicitly states that it is “[sjubject to the limitations contained in[, inter alia,] § 3.957.” 38 C.F.R. § 3.105(d). Section 3.957 states:
Service connection for any disability or death granted or continued under title 38 U.S.C., which has been in effect for 10 or more years will not be severed except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge. The 10-year period will be computed from the effective date of the Department of Veterans Affairs finding of service connection to the effective date of the rating decision severing service connection, after compliance with § 3.105(d).
38 C.F.R. § 3.957 (2009)[4] (implementing 38 U.S.C. § 1159).
Mr. Roberts’ argument that the last sentence of § 3.957 quoted above requires compliance with the substantive procedures of § 3.105(d) before service connection may be severed based on fraud is not persuasive. By the very wording of § 3.957, compliance with § 3.105(d) is required only with regard to computing the 10-year period for determining whether an award is protected from severance.[5] Thus, when, as here, a veteran has been service connected for a disability for over 10 years before any severance action, the severance may not take place except when, as pertinent hereto, the award of service connection was based on fraud. Otherwise stated, § 3.957 applies only when VA’s proposed severance of service-connected benefits is on a basis other than fraud or lack of requisite service, and then only when a disability has been service connected for more than 10 years. In such cases, § 3.957 prohibits the severance of service connection. Here, however, the severance action is predicated on fraud, and § 3.957 therefore is not applicable, other than to permit such severance to take place even though Mr. Roberts’ PTSD has been service connected for more than 10 years,
b. Language and History of § 3.105
The language of § 3.105 explicitly states that the section applies “except where an award was based on an act of commission or omission by the payee.” 38 C.F.R. § 3.105 (emphasis added). Proffering *426 fraudulent statements for the intended purpose of procuring VA benefits constitutes acts of commission or omission under § 3.105. An act of “commission” is the “act of committing or doing; perpetration, as of a crime” and an “omission” is a “failure to do something.” Black’s Law Dictionary 1116 (7th ed.1999); Webster’s New World Dictionary 280 (3d ed.1988). An act of “fraud” is defined by regulation as the “intentional misrepresentation of fact, or the intentional failure to disclose pertinent facts,” 38 C.F.R. § 3.1(aa)(2), and by legal treatise as the “intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some[thing of value],” 37 C.J.S. Fraud § 1 (2008). More generally, “fraud comprises all acts, omission, and concealments involving a breach of legal or equitable duty and resulting in damage to another.” Id. It embraces “all the multifarious means which human ingenuity can devise and are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of truth.” Id. (citing Ragland v. Shattuck Nat’l Bank, 36 F.3d 983 (10th Cir.1994)). Accordingly, acts of fraud fit clearly within the definition of “acts of commission or omission.”
The regulatory history of § 3.105 supports the argument that the regulation is not for application in cases of fraud. In 1936, VA Regulation and Procedural Rule (R. & P. R)-1009 (currently 38 C.F.R. § 3.105(d)), which governed the revision of rating board decisions, stated, in pertinent part:
(D) Except in case of fraud, ... when the breaking of service connection is contemplated under subparagraph (A), or before a rating breaking service connection is rendered under subparagraph (B), the claimant will be immediately notified in writing of the proposed action and given a reasonable period, not to exceed sixty days from the date on which notice is mailed to his last address of record, for the presentation of additional evidence in either writing or by hearing.
R. & P. R-1009(D) (Oct. 28, 1936) (emphasis added). Although R. & P. R-1009(D) underwent several revisions between 1936 and 1955, the text of the regulation clearly retained the intent to exclude cases of fraud from the procedural safeguards protecting claimants against the erroneous denial, reduction, or discontinuance of benefits. See R. & P. R-1009(D) (1937, 1942, 1945, 1947) (“This procedure is for application except (1) in case of fraud.... ”); VA Regulation (VAR) 1009(D) (1951, 1954, 1955) (“This procedure is for application except (1) in case of fraud.... ”).
In 1959, VAR 1009 was renumbered as VAR 1105 (currently 38 C.F.R. § 3.105) and that regulation was amended to include an introductory paragraph that reads: “The provisions of this paragraph apply except where there is fraud; a change of law, a change in interpretation of law specifically stated in a VA issue; or evidence establishes that service connection was clearly illegal.” VA Compensation and Pension (C & P) Transmittal Sheet 191 at 36. This amendment was announced as a “[r]estatement of VA Regulations 1009 and 2670.” VA C & P Transmittal Sheet 191 at ii. In December 1962, the introductory language of § 3.105 was amended to state, in relevant part, that “[t]he provisions of this section apply except where an award was based on an act of commission or omission by the payee or with his knowledge ([38 C.F.R.] § 3.500(b)).” Pensions, Bonuses, and Veterans Relief, 27 Fed.Reg. 11,886 (Dec. 1, 1962) (to be codified at 38 C.F.R. § 3.105).
The explanation accompanying these changes indicates that they were made necessary by Public Law 87-825, enacted *427 in October 1962, which governs the effective dates of awards of VA benefits, and states that consistent with the provision of 38 U.S.C. § 3012(b) (currently 38 U.S.C. § 5112(b)), “the preamble to paragraph 1105 has been amended to eliminate reference to ‘fraud’ and to substitute acts of commission or omission by the payee.” VA C & P Transmittal Sheet 267. The legislative history accompanying Senate Report 87-2042, notes that House Bill 7600 was proposed to amend 38 U.S.C. § 3012, governing the effective dates of awards, reductions, and discontinuances of monetary benefits, and would thereafter provide, in relevant part, that the “effective date of a reduction or discontinuance of an erroneous award based upon an act of commission or omission by the beneficiary shall be effective the date of the erroneous award.” S.Rep. No. 87-2042, at (9) (1962), reprinted, in 1962 U.S.C.C.A.N. at 3267. It was specifically noted that “[t]his is a restatement of existing law as it relates to fraud and is broadened to include other acts or failure to act on the part of the claimant, not necessarily fraudulent in nature, which constitute misrepresentation or other furnishing of incorrect information or failure to furnish correct information, leading to the establishment or continuation of an award of payments which should not have been made.” Id.
Also in 1962, upon the passage of House Bill 113, which gave rise to what is now 38 U.S.C. § 1159 (formerly 38 U.S.C. § 359), VAR 1105(D) was amended to state: “Subject to the limitations contained in VA Regulation 1957 [ (currently 38 C.F.R. § 3.957) ], service connection will be severed only where evidence establishes that it is clearly and unmistakably erroneous.” H.R. NO. 113 (1962). The purpose of the revision was to “exclude determinations of service connection which have been in effect for 10 or more years, and which are protected from severance by Public Law 86-501.” VA C & P Transmittal Sheet 236. When House Bill 113 was passed, a cross reference to VAR 1957, the regulation relating to the protection for service connection, was added to VAR 1105(D). Id.
c. Law Governing Effective Dates
Analysis of the law governing effective dates is consistent with the conclusion that § 3.105(d) does not apply to cases of fraud. In 1962, Congress amended 38 U.S.C. § 3012 (now 38 U.S.C. § 5112) concerning “Effective dates of awards,” to provide in subsection (b)(9) that, after determining that severance of an award of service connection has been made, the “effective date of a reduction or discontinuance of compensation, dependency and indemnity compensation, or pension ... by reason of an erroneous award based on an act of commission or omission by the beneficiary, or with his knowledge, shall be effective the date of the award.” Pub.L. No. 87-825 § 2, 76 Stat. 949 (1962). The explanatory statement accompanying that act indicates that that revision was a
restatement of existing law as it relates to fraud and is broadened to include other acts or failure to act on the part of the claimant, not necessarily fraudulent in nature, which constitute misrepresentation or other furnishing of incorrect information or failure to correct information, leading to the establishment or continuation of an award of payments which have been made.
Id. The current version of the statute contains language identical to that in effect in 1962. See 38 U.S.C. § 5112(b)(9). Its implementing regulation, 38 C.F.R. § 3.500, originates from VAR 2586, which in 1943 provided, in relevant part, that “[wjhere subsequent to the approval of an award, fraud is shown to have been committed ... the effective date of discontinuance shall *428 be as of the effective date of the award.” VAR 2586(H) (1943); VA C & P Transmittal Sheet 191. Section 3.500 of title 38, Code of Federal Regulations, currently provides, in pertinent part, that the effective date of a reduction or discontinuance of compensation due to an erroneous award based on an act of commission or omission by the payee will be the “[ejffec-tive date of award or day preceding act, whichever is later.” 38 C.F.R. § 3.500(b).

2. Procedural safeguards in cases of fraud.

The Secretary submits that § 3.103, rather than § 3.105(d), sets out the procedural processes that are applicable to severing fraudulently obtained awards of service connection. He asserts that § 3.105(d) provides the procedural due process for revocation proceedings and is therefore not at issue in this case. Section 3.103 of title 38, Code of Federal Regulations, provides every claimant “the right to written notice of the decision made on his or her claim, the right to a hearing, and the right of representation.” 38 C.F.R. § 3.103(a). Section 3.103 further states that claimants and their representatives shall be given notice of any decision affecting the payment of benefits and requires such notice to “clearly set forth the decision made, any applicable effective date, the reason(s) for the decision, the right to a hearing on any issue involved in the claim, the right of representation and the right, as well as the necessary procedures and time limits, to initiate an appeal of the decision.” 38 C.F.R. § 3.103(b). By its own terms, these procedures are applicable even in cases of fraud, as subsection (b)(2) of § 3.103 specifically states that “no award of compensation, pension or dependency or indemnity compensation shall be terminated, reduced or otherwise adversely affected unless the beneficiary has been notified of such adverse action and has been provided a period of 60 days in which to submit evidence for the purpose of showing that the adverse action should not be taken.” 38 C.F.R. § 3.103(b)(2). Indeed, the § 3.103 procedures closely track the procedures set forth in § 3.105(d) applicable to cases of severance in cases other than fraud, with procedures from both regulations satisfying general due process requirements. See Grovhoug v. Brown, 7 Vet.App. 209, 213 (1994) (setting forth provisions in title 38, Code of Federal Regulations, that require procedural due process, to include §§ 3.103 and 3.105); 38 C.F.R. § 3.103 (entitled “procedural due process and appellate rights”).
The Secretary also notes that the procedures set out in the M21-1MR support his position. The M21-1MR includes fraud in its defined acts of commission and omission and provides that, upon a preliminary finding of fraud, the beneficiary or fiduciary should be notified of the proposed adjustment; the reason for the adjustment; his or her right to present evidence, within 60 days, to rebut the evidence serving as the basis for the proposed adjustment and to show why the adjustment should not be made; and his or her right to representation and a personal hearing. M21-1 MR, pt. Ill, subpt. vi, ch. 5, sec. A (2007). The M21-1MR also provides that if no evidence is submitted within 65 days from the date that the notification letter was sent, the benefits award shall be amended, effective the beginning date of the award or the day preceding the date of the fraudulent act, whichever is later. Id. These procedures closely track the notification provisions of §§ 3.103 and 3.105(d) as well as the effective-date provisions of § 3.500(b).

3. Summary.

Accordingly, we conclude that the provisions of § 3.105 do not apply to cases involving severance of service connection based on fraud. Interpreted together, *429 §§ 3.957, 3.105, and 3.500 establish that when fraud is found to have formed the basis for an award of service-connected benefits, regardless of the length of time a claimant has been in receipt of those benefits, severance of the award can be made upon a showing of fraud alone. To hold otherwise ignores the plain language of the regulation, its place in the greater regulatory scheme, and prior law. See Gardner v. Derwinski, 1 Vet.App. 584, 586 (1991) (“Determining a statute’s plain meaning requires examining the specific language at issue and the overall structure of the statute.”), aff'd sub nom. Gardner v. Brown, 5 F.3d 1456 (Fed.Cir.1993), aff'd 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994); Johnson v. Brown, 9 Vet.App. 369, 371 (1996) (When “ ‘the plain meaning of a statute is discernible, that plain meaning must be given effect.’ ” (quoting Tallman v. Brown, 7 Vet.App. 453, 460 (1995))); Smith v. Derwinski, 2 Vet.App. 429, 431 (1992) (If a “reviewing court ‘find[s] the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances.’ ” (quoting Demarest v. Manspeaker, 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991))); see also King v. St. Vincent’s Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (holding that when interpreting a statute [or regulation], the court is required to look at the context and provisions of law as a whole); Imazio Nursery, Inc. v. Dania Greenhouses, 69 F.3d 1560, 1564 (Fed.Cir.1995) (holding that all parts of a statute must be construed together without according undue importance to a single or isolated portion); Smith v. Brown, 35 F.3d 1516, 1523 (Fed.Cir.1994) (noting that canons of statutory interpretation apply to interpreting regulations); Ventigan v. Brown, 9 Vet.App. 34 (1996) (stating that Board should have applied effective-date rules in section 5112(b) to sever an award of DIC benefits based on fraud rather than the CUE standard of § 3.105(d)); Allen and Venturella, both supra.
Although our dissenting colleagues suggest that our plain-language interpretation of § 3.105 runs contrary to the Secretary’s “longstanding position,” post at 432, the Secretary’s submissions to the Court demonstrate that the Secretary has no longstanding position on this issue. Specifically, in a response to an August 5 order, the Secretary averred that “no written guidance existed regarding procedures, practices[,] or policies used for severing service connection of protected ratings due to fraud,” either at the time of the August 2005 Board decision, or at any time thereafter. See Secretary’s response to the Court’s Order of August 5, 2009, at 1-2. Moreover, the Secretary also stated that a consistent position could not be discerned from its prior litigation positions, as the Secretary could uncover only two cases in which the Board addressed severance of service connection based on fraud. Id. at 4.
D. Application of Law

1. Notice.

By complying with the § 3.105(d) notice provisions, the RO also satisfied the § 3.103 and M21-1MR procedures and gave Mr. Roberts the appropriate opportunity to present evidence in opposition of severance. The only response received during the 60-day period from the date of notice of the proposed severance was Mr. Roberts’ request that the Board refrain from severing his service connection until he could appeal. When no evidence in opposition to severance was received during the 60-day period, the RO permissibly severed service connection, effective August 1993. See 38 U.S.C. § 5112(b)(9); 38 C.F.R. § 3.500(b), (k). Although Mr. Roberts thereafter submitted evidence to suggest that his award of service connection for PTSD was proper based on additional *430 stressors, he failed to submit evidence within the 60-day period and, as discussed above, the Board’s finding of fraud as the basis for severing service connection for PTSD was plausible upon review of the record as a whole. See 38 C.F.R. § 8.103; M21-1MR, pt. III, subpt. vi, ch. 5, sec. D (2007).[6]

2. Application of 38 C.F.R. § 3.105(d) is nonprejudicial.

Here, the Board needlessly applied the provisions of § 3.105(d); however, any error in the Board’s application of this subsection is nonprejudicial. See 38 U.S.C. § 7261(b)(2) (Court must take due account of the rule of prejudicial error); Shinseki v. Sanders, — U.S.-, 129 S.Ct. 1696, 1706, 173 L.Ed.2d 532 (2009) (the rule of prejudicial error requires Federal courts to review cases for errors of law without regard to errors that do not affect the parties’ substantial rights). The Board’s finding that the award of benefits for PTSD was based on fraud supported, as a matter of law, both the severance of the award and the assignment of an effective date for the severance action as of the date of the award. See 38 U.S.C. §§ 1159, 5112(b)(2); 38 C.F.R. §§ 3.105(d), 3.957; see also Allen, Venturella, and Ventigan, all supra.
E. Board Error in Adjudication of Other Claimed Disabilities
Although the Secretary is not required to process and adjudicate a claim for benefits in the same proceedings in which he processes and adjudicates an action to sever benefits based on a separate disability, he is not precluded from doing so. See Tyrues v. Shinseki, 23 Vet.App. 166, 179 (2009). In the decision on appeal, the Board also denied Mr. Roberts’ claims for VA benefits for tobacco use, alcohol abuse, a digestive disorder, erectile dysfunction, an eye disorder, obesity, chronic fatigue syndrome, a personality disorder, a cardiovascular disorder, pulmonary disorder, arthritis of the right knee, and dysthymia and depression, all claimed as secondary to PTSD, because it found that Mr. Roberts was no longer service connected for PTSD. R. at 32-33, 38-40. Secondary service connection is awarded when a disability “is proximately due to or the result of a service-connected disease or injury.” 38 C.F.R. § 3.310(a) (2009). Because Mr. Roberts’ award of service connection for PTSD has been severed, the Board correctly determined that he could not be awarded secondary service connection for any condition that is secondary to PTSD.
However, in Robinson v. Peake, this Court held that the Board is required to consider all issues raised either by the claimant or by the evidence of record. 21 Vet.App. 545, 553 (2008). In reaching this conclusion, the Court specifically stated that “[t]he proposition that separate theories in support of a claim for benefits for a *431 particular disability equate to separate claims for benefits for that disability is no longer the law.” Id. at 551. In Roebuck v. Nicholson, the Court recognized that “although there may be multiple theories or means of establishing entitlement to a benefit for a disability, if the theories all pertain to the same benefit for the same disability, they constitute the same claim.” 20 Vet.App. 307, 313 (2006). This statement of law does not amount to a requirement that the Board must “sua sponte ... raise and reject ‘all possible’ theories of entitlement in order to render a valid opinion.” Robinson, 21 Vet.App. at 553. Rather, the Board only commits error in failing to discuss a theory of entitlement that was raised either by the appellant or by the evidence of record. Id.
Here, Mr. Roberts raised, and the Secretary and Board adjudicated, a claim for benefits for dysthymia and depression, arguing that these conditions are directly related to service and were not secondary to his PTSD. Additionally, the September 1993 VA mental disorders examination report records a diagnosis of dysthymia. The Board denied compensation for dysthymia and depression because “the assignment of separate ratings under 38 C.F.R. § 4.25 assumes and requires the existence of a service[-]connected disability,” which Mr. Roberts no longer had. R. at 33-34. Although this statement adequately explains why service connection for dysthymia and depression is not warranted on a secondary basis, it does not address Mr. Roberts’ assertion that these conditions are directly connected to service.
Further, the Board indicated that it was without jurisdiction to consider Mr. Roberts’ arguments regarding direct service connection for dysthymia and depression on a basis different from that presented to the RO. See R. at 33 (stating that Board “may address only those issues developed and adjudicated by the RO. It may not modify issues to conform to recent events, even if such change benefits the veteran”). However, the Board erred: “Once the Board has jurisdiction over a claim ... it has the authority to address all issues related to that claim, even those not previously decided by the RO.” Jarrell v. Nicholson, 20 Vet.App. 326 (2006) (en banc); see also Buckley v. West, 12 Vet.App. 76, 82-83 (1998) (“Court has jurisdiction over claims that an appellant has reasonably raised to the RO and that the [Board] failed to properly adjudicate”); see also Bernard v. Brown, 4 Vet.App. 384 (1993) (Board’s inquiry is not limited to specific questions decided by RO but includes all questions reasonably raised by the record that were necessary to its decision on that matter).
Accordingly, remand is warranted for the Board to address service connection on a direct basis for dysthymia and depression. See Tucker v. West, 11 Vet.App. 369, 374 (1998) (remand is appropriate “where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate”); Bernard, supra. On remand, Mr. Roberts may present, and the Board must consider, any additional evidence and argument in support of the matters remanded. See Kay v. Principi, 16 Vet.App. 529, 534, (2002). These matters are to be provided expeditious treatment on remand. See 38 U.S.C. § 7112.
IV. CONCLUSION
Upon consideration of the foregoing, that part of the August 26, 2005, Board decision denying Mr. Robert’s claim for disability compensation for dysthymia and depression on a direct basis is SET ASIDE and the matters are REMANDED for further adjudication. The remainder *432 of the decision is AFFIRMED. See 38 U.S.C. § 7252(a).
GREENE, Chief Judge, filed the opinion of the Court.
HAGEL, Judge, filed an opinion concurring in part and dissenting in part in which SCHOELEN, Judge, joined.
LANCE, Judge, filed an opinion concurring in part and dissenting in part.

. On June 8, 2009, the parties were ordered to provide memoranda of law addressing, inter alia, the question whether 38 C.F.R. § 3.105(d) applies to severing service connection once the Secretary determines that because of fraud the veteran’s service connection is no longer protected under 38 C.F.R. § 3.957. The Court also requested the participation of amici. Subsequently, in response to a Court order, the parties filed supplemental memoranda of law regarding the relevance, if any, of the forfeiture provisions of 38 U.S.C. § 6103(d)(1).

. The Secretary acknowledges that this position differs from his initial presentation to the Court that the Board properly applied § 3.105(d). He states that upon further review of the regulatory history of § 3.105, it is evident that "by its own terms, ... § 3.105, including § 3.105(d), is inapplicable in cases, such as the instant one, where severance of service connection is predicated on fraud.” Secretary’s Memorandum of Law at 1-4.

. Although the Court may take judicial notice of the fraud determination made by U.S. District Court for the Eastern District of Wisconsin, see Brannon v, Derwinski, 1 Vet.App. 314, 316 (1991) ("Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions.”), having found no error in the Board’s determination that Mr. Roberts committed fraud in securing VA benefits for his PTSD, we need not address the Secretary's argument that the Court is bound by the district court’s finding, which postdated the decision of the Board.

. In its current form, 38 C.F.R. § 3.957 has undergone no substantive changes since 1968 when it was amended to extend the protection of service connection in force for 10 years or more to claims for dependency and indemnity compensation or death compensation.

. Section 3.105(d) provides a time period within which a claimant may submit evidence to show that service connection should be maintained, and states that if the evidence is not received during that period, then a final rating action may be taken reducing or discontinuing the award. The computation of the 10-year period is not at issue here. It is undisputed that service connection for the appellant’s award had been in effect for more than 10 years when the RO proposed severance.

. Contrary to our dissenting colleagues’ statement that we "today erect[] a total bar to benefits” for the appellant and "any veteran who commits an act of fraud in the pursuit of benefits,” that is simply not true. To the extent the appellant believes that he, during the severance proceedings, submitted to VA evidence suggesting that service connection for PTSD is warranted based on stressors other than the stressor found to be fraudulent, the appellant may pursue any such pending claim for benefits with VA. See DiCarlo v. Nicholson, 20 Vet.App. 52, 56-57 (2006) (holding that, where a claim remains unadju-dicated because the Secretary failed to process it, the appropriate resolution "is to pursue a resolution of the original claim, e.g., seek issuance of a final [regional office] decision with proper notification of appellate rights and initiate a [Notice of Disagreement].”). Here, the Board did not adjudicate a claim for service connection for PTSD based on stressors other than the stressor found to be fraudulent (e.g., the shore patrol incident) and was not required to do so as part of the severance proceeding.